In the Matter of New York Quotation Company, Petitioner, against George M. Bragalini et al., Constituting the State Tax Commission, Respondents.

Third Department, April 23, 1959.

*Milbank, Tweed, Hope & Hadley (William Eldred Jackson, Howard O. Colgan, Jr., and Richard S. Harrell of counsel), for petitioner.*

*Louis J. Lefkowitz, Attorney-General (Edwin R. Oberwager and Paxton Blair of counsel), for respondents.*

*Per Curiam.* This is an article 78 proceeding to review a determination of the New York State Tax Commission denying petitioner's application for a refund of utilities taxes paid between November 30, 1951 and November 30, 1956 on the furnishing of utility services pursuant to section 186-a of the Tax Law. The sole question is whether or not the petitioner is a "utility" within the meaning of section 186-a.

Section 186-a as relevant provides: "the word 'utility' includes every person subject to the supervision of the state department of public service * * * and also includes * * * every person (whether or not such person is subject to such supervision) who sells * * * telegraphy, delivered through * * * wires, or furnishes * * * telegraph service, by means of * * * wires; regardless of whether such activities are the main business of such person or are only incidental thereto, or of whether use is made of the public streets * * *".

Petitioner, the New York Quotation Company, was incorporated in 1889, pursuant to the Transportation Corporations Law, formerly known in part as the "Telegraph Act." (L. 1848, ch. 265.) Since 1903 the New York Stock Exchange has been its sole stockholder. Pursuant to a contract the New York Stock Exchange supplies market information to the petitioner. In turn, petitioner furnishes "tickers" to subscribers on which the continuous quotations of stock and bond transactions, the bid and asked prices, ex-dividend notices and other notices dealing with listed securities on the New York Stock Exchange are printed. The subscribers, all located in New York City, pay a monthly fee for the service, and only persons approved by the Stock Exchange may receive the service.

Prior to August 1, 1952, the market information was sent to petitioner's ticker transmitting plant, which is located in the same building as the Exchange, through pneumatic tubes, where petitioner's employees would change the information in the sales slips on a typewriter type keyboard into electrical impulses. The impulses were sent through a transmitter to a terminal plant from which they were sent out over wires to the subscribers. The wires are leased from the City of New York except for a few wires leased from the Western Union Telegraph Company.

Subsequent to August 1, 1952, the Exchange's employees kept the petitioner's books and billed the petitioner's subscribers on the petitioner's billheads, for which service the Exchange received a fee, but the payment of the bills was made direct to the petitioner. Payments are also made by petitioner to the Exchange for supplying of quotation information in the form of electrical impulses. The Exchange leases the ticker plant for a specified monthly rental.

Petitioner relies primarily on *Holmes Elec. Protective Co.* v. *City of New York* (304 N. Y. 202) and on *Matter of Holmes Elec. Protective Co.* v. *McGoldrick* (262 App. Div. 514, affd. without opinion 288 N. Y. 635). These cases, held in substance that a company which provided a telegraphic burglary alarm and protection service was not a "utility" within the meaning of a New York City Local Law which is similar to section 186-a. (Under section 20-b of the General City Law the power of a city to tax utilities is limited by section 186-a of the Tax Law.) The test of whether a person is a utility within the meaning of the statute is whether the person is selling telegraphic service, as such is ordinarily understood. At page 517 of the 1941 *Holmes* case (262 App. Div. 514) the court said: "The electric signals transmitted over petitioner's wires are only incidental to the ultimate contractual purpose between petitioner and its customers, namely, protection of the customer's premises from unauthorized entry. What the customer buys and pays for is not a telegraph service. *That consists essentially in the mere transmission of communications, the service of the telegraph company being completed when the message has been transmitted.* Petitioner's customers were purchasing and petitioner was selling what began when the electric signals were transmitted, namely, some form of protection of the customers' premises." (Emphasis supplied.)

It is our view that the petitioner does furnish telegraph service in the ordinary sense of the word and therefore, is a utility within the meaning of the statute. It is our opinion that the *Holmes'* cases (*supra*) are distinguishable because the facts and the nature of the business were substantially different from the situation in the present case. In the *Holmes'* cases (*supra*) the transmission of the "message" was incidental and only a small part of the service being purchased, that is, burglar protection. Here the service, transmission of "messages" (stock quotations), is complete upon receipt by the customer.

Telegraph service in the ordinary sense envisions a sender, a transmitter, and a receiver, with the sender delivering a message to the transmitter for transmission. Normally the sender pur-

chases the transmission service. Here the receiver purchases the service. This difference does not change the nature of the service involved.

Petitioner contends that it is furnishing an information service rather than a telegraph service. However, the subscriber could receive the information in various other ways, for example, by radio, newspaper or telephone. What the subscriber is primarily interested in is the instantaneous transmission of the information furnished by petitioner. The subscribers are for the most part brokers who need the market quotations immediately after the sales take place on the Exchange floor. As noted before, the record shows that the average time interval from the time of the consummation of a sale on the floor to the time a report of the transaction reaches the subscriber through his ticker machine is one to three minutes.

Prior to August of 1952 petitioner had its own employees convert the market information released by the Exchange into electrical impulses and since that time the Exchange, for a fee, has performed this work for the petitioner. It is clear that the petitioner's only concern with the market information is to convert it into electrical impulses for transmission as a telegrapher in a Western Union office would convert a message into electrical impulses for transmission. In addition the amount which the petitioner pays for the conversion of the market information bears the same ratio to the total expenses of the Exchange for gathering and converting market information into electrical impulses as the number of petitioner's subscribers bears to the total number of subscribers receiving quotation service throughout the country. This fact indicates also that there is no charge for the information as such; but, that the charge is for the transmission of the information and that telegraph service is being sold.

Returning to the illustration of a sender, transmitter and receiver, under the instant arrangement it could be said that the Exchange is in a sense a sender. It supplies the information for the message. Also, it determines who the recipients will be inasmuch as no person can obtain the service without the approval of the Exchange.

Petitioner's other arguments concerning the restrictions on subscribers, the limited nature of communication available and the absence of Public Service Commission jurisdiction are not relevant because a " utility " is defined by the statute.

Therefore it is our opinion that the commission correctly determined from the record that the petitioner was furnishing telegraph service within the meaning of the statute.

The determination should be confirmed, with $50 costs.

FOSTER, P. J., COON, GIBSON, HERLIHY and REYNOLDS, JJ., concur.

Determination confirmed, with $50 costs.